Filed 12/3/21  P. v. McDaniels CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

<table>
<tr><td>THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>SHELTON McDANIELS,<br><br>     Defendant and Appellant.</td><td>A158181<br><br>(Alameda County<br>Super. Ct. No. 604145C)</td></tr>
</table>

Defendant Shelton McDaniels participated in a gun battle that resulted in the killing of an innocent bystander, Chyemil Pierce.  A jury convicted McDaniels of second degree murder and found true various firearm enhancements, including that he personally and intentionally discharged a firearm causing death.  It also convicted him of possession of a firearm by a felon and evading a peace officer.  The trial court sentenced him to 40 years to life in prison.

On appeal, McDaniels challenges only his murder conviction and the accompanying enhancements.  He claims that there was insufficient evidence that his actions proximately caused Pierce's death, as it was conceded he did not fire the fatal bullet.  He also claims that the trial court improperly omitted jury instructions on provocative act murder and involuntary manslaughter and that instructions on proximate cause and the union of act and intent were legally incorrect.  McDaniels further claims that his trial

1

counsel rendered ineffective assistance by failing to request an instruction based on a change in Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill 1437) to the imputation of malice and by not objecting to the prosecutor's comments on McDaniels's courtroom demeanor. McDaniels also argues that the prosecutor relied on racial stereotypes during the trial. Finally, McDaniels contends that the cumulative effect of all the alleged errors requires reversal. We are not persuaded by any of these claims and therefore affirm.

## I.
### FACTUAL AND PROCEDURAL BACKGROUND

McDaniels was tried in the summer of 2019 with Julian Ambrose, another participant in the gun battle. Ambrose, who was 16 years old at the time of the murder and testified in his own defense, reached a plea agreement with the prosecution after the prosecutor presented his initial closing argument. Four other participants—Anthony Sims, Alex Davis, Michael Stills, Jr., and Jerry Harbin—were tried together for murder in 2017, and this panel affirmed the convictions of Sims, Davis, and Stills in two previous opinions. (*People v. Sims* (Sept. 4, 2020, A155339) [nonpub. opn.] (*Sims*); *People v. Davis* (Mar. 27, 2019, A152259 & A153136) [nonpub. opn.] (*Davis*).)[1]

_____

[1] "After the jury indicated it was deadlocked on the murder charge against Harbin, he pleaded no contest to voluntary manslaughter, and he was sentenced to 13 years in prison in July 2017. Davis and Stills were convicted of second degree murder and various firearm enhancements, and later that year they were sentenced, respectively, to 40 years to life in prison and 16 years to life in prison." (*Sims*, *supra*, A155339.) Sims was also convicted of second degree murder but "was not sentenced until July 2018, to allow for time to make a record for a future youth offender parole hearing." (*Ibid*.) At

Much of the evidence presented in this trial was similar to the evidence presented in the previous trial of Sims, Davis, Stills, and Harbin, but there were also significant differences. Thus, although our background discussion uses the same general structure and some of the same phrasing as that in *Sims* and *Davis*, we do not draw our description of the facts from those opinions.

## A. Background

On the afternoon of March 9, 2015, Pierce was killed near the intersection of 30th Street and Chestnut Street (the intersection), in an area of West Oakland nicknamed "Third World." Chestnut runs north to south, and 30th runs east to west. Adeline Street runs parallel to Chestnut, to the west, and 28th Street runs parallel to 30th, to the south.

Of the people charged with crimes in connection with Pierce's murder, several were associated with the Third World neighborhood: McDaniels; Harbin, whom McDaniels considered his "brother"; Davis; and Stills.[2] The other people charged were associated with another neighborhood of West Oakland known as "the Bottoms": Joneria Reed; her son, Dijon Ward; Reed and Ward's cousin, Sims; and Ambrose, who was friends with Ward.[3] As was true in the previous trial, little evidence suggested there was any tension between the two neighborhoods at the time of the murder. Rather, several

_____

the prosecutor's request, the firearm enhancements found true against him were stricken, and he received a term of 15 years to life in prison. (*Ibid.*)

[2] No evidence was presented in this trial about the role Stills played in the shooting, and we do not mention him again.

[3] Ward testified that he pleaded no contest to being an accessory after the fact and received probation. As she did in the previous trial, Reed testified for the prosecution in this case under an agreement that if she was truthful, she would be allowed to withdraw her plea to murder and receive a six-year sentence for voluntary manslaughter.

3

witnesses testified that the conflict that day grew out of personal disagreements, and there were many friendships and other connections between the two groups.

The prosecutor sought only a second degree murder conviction, and he did not attempt to prove that McDaniels was Pierce's actual killer. Rather, as we discuss in more detail below, there was evidence that during the incident McDaniels fired two firearms, a rifle and a Glock pistol, and the prosecutor urged the jury to find that McDaniels acted with implied malice by contributing to a dangerous situation that culminated in Pierce's death. The jury was also instructed on perfect self-defense or defense of another and voluntary manslaughter based on imperfect self-defense or defense of another and heat of passion.

### B. The Fight Between Harbin's Girlfriend and J.G.

On the afternoon of the murder, Harbin and his girlfriend arrived at Third World in his red Porsche SUV. Harbin's girlfriend wanted to find her friend, R.B., who lived in the neighborhood. R.B. had dated Donald Ward, Ward's brother and Reed's son, until his murder a few months earlier. R.B. was in the beginning stages of a relationship with McDaniels, with whom she maintained contact after his arrest but had stopped talking to by the time of the summer 2019 trial.

Reed and her sister had driven to Third World earlier on the afternoon of March 9. Reed testified that McDaniels, whom she did not know by name, was present when she arrived. His white Mercedes sedan was parked on the northern side of 30th, near the northwest corner of the intersection, and Reed's sister participated in a dice game taking place by his car. J.G., the mother of Ward's child, subsequently arrived with two of her female cousins.

4

Harbin's girlfriend testified that when she and Harbin arrived in the area, R.B. was around a group of other women. That group included Reed, J.G., and J.G.'s cousins. Harbin's girlfriend got out of the Porsche to try to persuade R.B. to come with her, but R.B. refused. The other women then began to "taunt" and "stare at" Harbin's girlfriend.

Harbin's girlfriend testified that before she could leave, she got into a fist fight with J.G., with whom she was on bad terms. Harbin's girlfriend was bigger than J.G., and witnesses agreed that Harbin's girlfriend was winning the fight. Several other women then got involved in the fight to help J.G., including both of her cousins. R.B. also intervened in an attempt to stop the fight.

Meanwhile, Harbin got out of the Porsche and also tried to break up the fight. When J.G.'s younger cousin tried to hit his girlfriend, however, he "shoved" the cousin's face, causing her to cut her lip on her braces.[4] Reed then intervened in the fight, and Harbin pushed her to the ground.

Reed testified that she got up and asked Harbin "why he put his fucking hands on [her]." A neighbor who lived near the intersection testified that she noticed "a lot of commotion" and heard a woman say something like, "You Third World some punk [ass niggas], and you gonna push a woman down on the ground."

Reed then heard someone in the crowd say "[s]omething like, 'Oh, that's Donald's mama. What you be trippin' on?'" According to Reed, Harbin responded, "Fuck her and her dead-ass son." J.G.'s cousins testified that they also heard this response, but R.B. and Harbin's girlfriend did not hear Harbin say anything about Reed's son.

---

[4] The younger of J.G.'s cousins did not testify at this trial, but some of her testimony at the previous trial was read into the record.

Harbin and his girlfriend got back into the Porsche.  Before they could leave, J.G. approached the passenger's-side window and tried either to pepper spray or to tase Harbin's girlfriend.  J.G.'s cousins both saw Harbin pull out a gun and point it toward J.G., causing her to back away from the Porsche.  Harbin's girlfriend denied ever seeing Harbin with a gun, however, and indicated that the other witnesses were lying about this.  Harbin and his girlfriend left, and Harbin dropped his girlfriend off a few blocks away.

C.    *Reed Calls Ward and Sims to the Scene.*

Harbin's girlfriend testified that before leaving Third World with Harbin, she observed Reed get on the phone and say, "Get over here right now.  This nigga just put his hands on me."  R.B. also heard Reed make similar statements and "demand" that Ward come to the scene.  Reed admitted that, feeling "disrespected," she called Ward and told him that "someone had just put their hands on [her]."  Reed also called Sims and told him what had happened because she "did not want [her] son to be there alone."  Reed indicated that she called the men because, being in an "unfamiliar" area, she felt like she needed some protection.  She denied, however, that she actually "asked them to come down and help [her]."

Reed did not remember seeing McDaniels in the area after she made the phone calls.  J.G.'s younger cousin, however, testified that McDaniels "said something . . . like, 'You bitches aren't from around here,' " and told her and her cousins to leave.  The older cousin recalled hearing him say "something about his brother because that's when [she] realized that the situation was bad because his brother . . . was the guy in the red truck," namely Harbin.  The younger cousin testified that McDaniels "was talking about shooting."  Both cousins then saw him run into a nearby house, and the older cousin claimed he quickly came back out holding a "big gun" that was

6

about three feet long.  Scared, the older cousin left with the younger cousin, but J.G. went to R.B.'s house to clean her face, which was bleeding.

Ambrose testified that meanwhile, he was asleep at Ward's house when Ward woke him up and "told [Ambrose] that he wanted [Ambrose] to ride with him."  They left in Ward's car, a blue Acura, and Ward told Ambrose they were going to Third World because Ward's "mom had been pushed."

Soon, Ward and Ambrose arrived at the intersection.[5]  Ambrose testified that he "could sense there was some kind of a tension because there was just like a bunch of people out there."  Before getting out of Ward's car, Ambrose retrieved a handgun from under the front passenger's seat, which he claimed was left there earlier that day by another acquaintance of Ward's.

Ward and Ambrose approached Reed to check on her.  Reed testified that after comforting her, Ward "went to talk to some guys in the area," a group that included McDaniels.  R.B. recalled seeing Ward and McDaniels talking to each other.  Both Reed and R.B. testified that Davis was also in the area around this time.

Ambrose testified that in the meantime, he returned to Ward's car, which was parked on 30th at the southwest corner of the intersection, and stood outside it, facing away from the street.  R.B. testified that she approached Ambrose, with whom she was "close," to explain what had happened with Reed.  She was not able to talk to him before the shooting started, however.

---

[5] R.B. testified that Ward's father and Sims were with Ward and Ambrose.  Ambrose testified that he and Ward arrived alone and Sims arrived soon afterward, before the shooting.  Ward told the police that he drove to Third World by himself.  Reed also denied seeing Sims at the scene, but she testified that Ward's father picked up her and her sister on 30th immediately after the shooting.

### D. Harbin Returns, and the Shooting Begins.

R.B., who was standing near the southeast corner of the intersection, saw Harbin driving west on 30th toward Adeline in what was stipulated to be his rental Buick sedan. She and Reed testified that Reed's sister yelled, "There that nigga go right there." Ambrose also admitted hearing someone yell that.

R.B. testified that she saw first Ambrose and then Sims, both of whom were near the southwest corner of the intersection, shooting handguns toward Harbin's car, which eventually crashed. Reed testified that she saw Ambrose pointing a black gun. R.B. also saw Davis, who was standing on Chestnut near its northern intersection with 30th, shooting a handgun toward Ambrose and Sims.

According to Ambrose, he did not shoot until after the gunshots started and he was hit in the back of his shoulder. After stumbling forward, he took out his gun. Before he could shoot it, he was "shot two more times" from the direction of 30th, and he then "just started to fire blindly with [his] eyes closed" toward 30th. After being shot, he ran south on Chestnut before collapsing near a house a few doors from the intersection. He indicated that as he was running, he continued to hear gunshots and kept firing behind him because he thought people were chasing him.

R.B. acknowledged that McDaniels was present when the shooting began and that Harbin's car passed by where he was, but she testified that she did not remember seeing him shoot. She also testified that she never saw him with a rifle. Likewise, Reed testified that she never saw McDaniels with a weapon. When R.B. spoke to police after the murder, she told them that McDaniels was also shooting but subsequently said she did not see him shoot. She explained at trial that her initial statement that McDaniels was shooting

8

was based on "hearsay" from others and not anything she witnessed firsthand.

McDaniels was later recorded in jail talking about the shootout, and the recording was played for the jury. After indicating that Sims, whom McDaniels mistakenly believed shot Pierce, was in the hospital, McDaniels stated, "But that the one [Sims], that's one of the ones I got on though. Yeah. I hit him." Then, referring to Ambrose, McDaniels said, "He the one that initiated everything. He got on big bro [Harbin]. He wake the car up. Doom, doom, doom, doom. That's the one I drop first right. So when he get dropped. The other lil nigga [Sims] start busting. He try to get on me. I clip him off the dribble. Boom, boom. Nigga look out nigga. Drop him. I'm going for the kill though on his partner [Ambrose]. So he [Sims] . . . spared him because when he, when he busted at me, the lil nigga [Ambrose] got back up. The other lil nigga that I just dropped, he got back up. . . . [¶] . . . But um, yeah, him, him and the other lil nigga. The other lil nigga, I fucked him over."

Ambrose testified that he did not see who was shooting at him, and he specifically denied seeing McDaniels shoot. A month after the shooting, however, Ambrose gave police a description of the man who shot at him that matched McDaniels's description. At trial, Ambrose claimed that he was lying to police about the characteristics of the man who shot him, but he also indicated that he would not identify that person even if he knew who it was.

E.      *Pierce Is Killed and the Shooters Flee*.

Pierce lived on Chestnut close to its intersection with 28th, on the west side of the street. A contractor who was working at Pierce's house that day testified that he saw her arrive home in her car with her children. As she was parking, he heard gunshots from "two or three guns," and he dropped to

the ground.  There was a break in the gunshots, and then they began again but sounded "bigger and louder."

A neighbor of Pierce's heard "close to a hundred gunshots from . . . several different guns," likening it to "a war zone."  She testified that there were "a lot of gunshots," then "a small pause" as if the participants were reloading, and then "more."  Another neighbor of Pierce's testified that she heard several gunshots, with a short pause in the middle, and then looked outside and observed Pierce "yelling at her kids to run."  The neighbor saw Pierce fall on the ground as she was running behind her children.  It was later determined that Pierce died from a single gunshot to the head and neck.

This neighbor then saw two teenaged males run down Chestnut, each holding a handgun.  Although the neighbor heard gunshots while the men were running, she did not see either of them actually shooting.  She testified that the two men ran toward a dark blue Audi station wagon or SUV, in which there was another man motioning to them, and the car drove away with all three men in it.  Similarly, the contractor testified that when he looked outside, he saw a black Audi SUV that was revving its engine and two men, one bleeding from the chest, "chasing after the car."

Another neighbor testified that she heard "tons of gunshots" that sounded like "a wild west shootout."  The shots originally seemed like they were coming from farther away but then got closer.  She looked out the window and saw a dark Audi or BMW driving south on Chestnut.  At least three young men, one of whom looked like he had been shot in the chest and was holding a handgun, were running alongside the car as if trying to get into it.  The neighbor also saw a man with dreadlocks who seemed to be chasing the others while pointing a gun toward them.  Davis was the only person charged in connection with the homicide who had dreadlocks.  And

when shown a picture of Davis, the neighbor agreed that his dreadlocks looked like the ones on the man she saw pointing the gun.

      *F.*     *The Aftermath and the Physical Evidence*

Harbin's girlfriend testified that she returned to Third World with a few friends "to go look for the girls that jumped [her]." As they arrived, they heard someone say that a woman was killed, and they saw Pierce lying on the ground. Harbin's girlfriend walked up Chestnut and observed Ambrose, who was like a "cousin" to her, lying on the side of a house, bleeding. Ambrose was taken to the hospital, where he had to stay for several weeks. Sims had been shot multiple times in the chest, and he also went to the hospital.

Harbin's rental Buick was recovered later that night. Its rear window had been shot out, and it had bullet holes caused by shots fired from both inside and outside the vehicle. Two .45-caliber shell casings were found in and around the car, one on the rear driver's-side floorboard and one underneath the car. There was blood at shoulder level on the driver's seat.

A second girlfriend of Harbin's, who had begun dating Harbin a few weeks earlier, testified that on the day of the murder, he contacted her and "said that they were trying to kill him, that they were shooting at him and he was defending [himself]." He had been shot in the back. The girlfriend rented a hotel room in Hayward for Harbin and McDaniels, and the three went there. Both men had guns. The girlfriend had seen McDaniels with Harbin on several prior occasions, and she testified that they and other men they hung out with were often trading guns back and forth.

The evidence showed that at least six different weapons were fired at the scene. First, a Springfield Armory semi-automatic .45-caliber pistol, which had Sims's blood on it, and two boxes of .45-caliber ammunition were recovered from Reed's sister's house. A cluster of five casings discharged by

11

that gun were recovered in the street near the southeast corner of the intersection. In addition, three bullets fired from that gun were located farther west on 30th, toward Adeline.

Second, the two .45-caliber shell casings found in and around Harbin's rental car were fired by the same gun, which was not the Springfield Armory pistol tied to Sims. This firearm was never recovered, but it was reasonable to infer Harbin shot it, given that the casings were in and around the Buick when it was recovered at a separate location.

Third, a Bersa Mini Firestorm .40-caliber pistol, which Ambrose identified as the gun he used and had his blood on it, was found near where he collapsed. Nine casings from the Firestorm were found at the scene: six clustered on 30th near the southwest corner of the intersection, and three around the corner on Chestnut, a few doors south of the intersection.

Fourth, four .223-caliber casings fired by the same gun were recovered on Chestnut a few doors south of the intersection, near the second group of casings fired by Ambrose's gun. A criminalist testified that the casings were fired by an "AR-15 or M-16 type of rifle." No AR-15 or other similar gun was ever recovered, but .223-caliber ammunition was recovered from Harbin's second girlfriend's apartment. The girlfriend testified that a few days after she took them to the Hayward hotel, Harbin and McDaniels arrived at her apartment to pack up items from a closet which she allowed Harbin to use for storage. Harbin had a gun that was about three feet long, and she refused to let him bring it inside. Along with J.G.'s older cousin's testimony, this evidence tended to suggest that McDaniels used a rifle during the shootout.

Fifth, a Glock .40-caliber pistol was also recovered from the apartment of Harbin's second girlfriend. She testified that after Harbin and McDaniels packed and departed, she found the gun hidden in her reclining chair. The

12

Glock had Harbin's DNA on it but not McDaniels's. That gun fired 20 of the casings found at the scene. Five were on the sidewalk at the intersection's southwest corner and the rest, as well as a bullet fired by the same gun, were in the street on 30th, slightly west of the intersection. As we discuss in more detail below, it is reasonable to infer that McDaniels also shot this gun.

Finally, a single .38/.357-caliber bullet shot by an unrecovered firearm was found a couple feet from Pierce's head and had her DNA on it. The criminalist testified that the bullet was of a caliber "most commonly associated with revolvers," a type of gun that does not expend casings. The evidence suggested, by process of elimination, that Davis fired this gun, as Ward denied having a gun and no one testified to seeing him with one.

Four days after the murder, McDaniels and Harbin were apprehended after a high-speed chase during which McDaniels was driving. A 9mm Taurus firearm was recovered in the street near the car's passenger side, where Harbin had been sitting, but that gun did not fire any of the bullets or casings found at the murder scene.

### G.  *The Verdict and Sentencing*

McDaniels was charged with one count of murder with the accompanying allegations that he personally used a firearm, personally and intentionally discharged a firearm, and personally and intentionally

13

discharged a firearm causing death.[6]  He was also charged with felony counts of possession of a firearm by a felon and evading a peace officer.[7]

The jury convicted McDaniels of second degree murder and found true the firearm enhancement allegations.  It also convicted him of the other two felonies charged.  In July 2019, the trial court sentenced McDaniels to 40 years to life in prison, composed of a term of 15 years to life for the murder and a consecutive term of 25 years to life for the personal and intentional discharge of a firearm causing death.  Terms for the remaining convictions and firearm enhancements were imposed and stayed.

II.

DISCUSSION

A.   *There Was Sufficient Evidence that McDaniels Proximately Caused Pierce's Death.*

McDaniels claims that his murder conviction and the enhancement for personal and intentional discharge of a firearm causing death must be reversed because there was insufficient evidence that his actions proximately caused Pierce's death.  We are not persuaded.

---

[6] The murder charge was brought under Penal Code section 187, subdivision (a), and the firearm enhancements were alleged under Penal Code sections 12022.5, subdivision (a), and 12022.53, subdivisions (b) and (g) (personal use), and section 12022.53, subdivisions (c) (personal and intentional discharge) and (d) (personal and intentional discharge causing death).  All further statutory references are to the Penal Code unless otherwise noted.

[7] The firearm-possession charge was brought under section 29800, subdivision (a)(1), and the evading charge was brought under Vehicle Code section 2800.2, subdivision (a).  Although the information also contained several prior-conviction allegations, the prosecutor dismissed them before sentencing.  At trial, the parties stipulated that at the time of the murder, "McDaniels was a convicted felon having been convicted of a felony within [10] years of that date."

14

1. General legal standards

Second degree murder is " 'the unlawful killing of a human being with malice aforethought but without the additional elements, such as willfulness, premeditation, and deliberation, that would support a conviction of first degree murder.' [Citation.] Malice may be either express (as when a defendant manifests a deliberate intention to take away the life of a fellow creature) or implied. [Citation.] 'Malice is implied when the killing is proximately caused by " 'an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that [the act] endangers the life of another and who acts with conscious disregard for life.' " ' " (*People v. Cravens* (2012) 53 Cal.4th 500, 507 (*Cravens*).)

" 'The principles of causation apply to crimes as well as torts. [Citation.] "Just as in tort law, the defendant's act must be the legally responsible cause ("*proximate cause*") of the injury, death[,] or other harm which constitutes the crime." ' [Citation.] So too, California criminal law relies on civil law formulations of concurrent and superseding cause." (*People v. Brady* (2005) 129 Cal.App.4th 1314, 1324 (*Brady*).) "The question of proximate cause is ordinarily decided by the jury, unless undisputed evidence reveals 'a cause so remote that a court may properly decide that no rational trier of fact could find the needed nexus.' " (*People v. Gonzalez* (2012) 54 Cal.4th 643, 656.)

"In homicide cases, a 'cause of death . . . is an act or omission that sets in motion a chain of events that produces as a direct, natural and probable consequence of the act or omission the death of [the victim] and without which the death would not occur.' [Citation.] In general, '[p]roximate cause is clearly established where the act is directly connected with the resulting

15

injury, with no intervening force operating.'" (*People v. Cervantes* (2001) 26 Cal.4th 860, 866 (*Cervantes*).) Even if there is an intervening force, however, "that does not end our inquiry, because the 'defendant may also be criminally liable for a result directly caused by [the defendant's] act, even though there is another contributing cause.'" (*Id.* at pp. 866–867.)

In determining whether an intervening force relieves a defendant of liability for a death, the touchstone is whether the death was foreseeable. (See *Brady*, *supra*, 129 Cal.App.4th at pp. 1324–1325.) "'In general, an "independent" intervening cause will absolve a defendant of criminal liability. [Citation.] However, in order to be "independent" the intervening cause must be "unforeseeable[,] . . . an extraordinary and abnormal occurrence, which rises to the level of an exonerating, superseding cause." [Citation.] On the other hand, . . . "[i]f an intervening cause is a normal and reasonably foreseeable result of [the] defendant's original act the intervening act is 'dependent' and not a superseding cause, and will not relieve [the] defendant of liability. [Citation.] '[] The consequence need not have been a strong probability; a possible consequence which might reasonably have been contemplated is enough.'"'" (*Cervantes*, *supra*, 26 Cal.4th at p. 871.) All that is required is either that the intervening cause itself was foreseeable "or, if not foreseeable, [that] it caused injury of a type which was foreseeable." (*Brady*, at p. 1326; accord *People v. Dawson* (2009) 172 Cal.App.4th 1073, 1095; see *Cervantes*, at p. 871.)

In evaluating a claim of insufficient evidence, "'we review the whole record to determine whether . . . [there is] substantial evidence to support the verdict . . . such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] In applying this test, we review the evidence in the light most favorable to the prosecution and presume in

support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence.' " (*People v. Manibusan* (2013) 58 Cal.4th 40, 87.)  Reversal is not appropriate unless " 'it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction]." ' " (*Cravens, supra*, 53 Cal.4th at p. 508.)

        2.     Analysis

Relying primarily on *Cervantes*, McDaniels argues that there was insufficient evidence to sustain the murder conviction.  In that case, the defendant and several members of his gang, Highland Street, went to a party thrown by members of another gang, Alley Boys.  (*Cervantes, supra*, 26 Cal.4th at p. 863.)  The two gangs were not enemies at the time.  (*Ibid.*)  After the defendant got into a verbal dispute with an Alley Boys member, that man drew a gun and threatened to kill the defendant.  (*Ibid.*)  The defendant then brandished his own gun, and when a third man, also an Alley Boys member, attempted to intervene, the defendant shot and wounded him.  (*Ibid.*)  Someone in the crowd said that a Highland Street member had shot the third man, "[a] melee erupted, and gang challenges were exchanged." (*Ibid.*)  Within a minute or so, a group of Alley Boys saw a different Highland Street member getting in his car and shot him to death, and the defendant was convicted of second degree murder for this death.  (*Id.* at pp. 863–865.)

*Cervantes* held that the defendant's conviction, which was premised on the provocative act murder doctrine, could not be sustained because there was insufficient evidence of proximate causation.[8]  (*Cervantes, supra*, 26 Cal.4th at pp. 865–866, 874.)  The Supreme Court explained that the facts

---

[8] As we discuss further below, the provocative act murder doctrine is a type of implied malice that applies when "criminal defendants neither kill nor intend to kill, but cause a third party to kill in response to their life-threatening provocative acts." (*Cervantes, supra*, 26 Cal.4th at p. 867.)

before it were "distinguishable from the classic provocative act murder case in a number of respects. [The d]efendant was not the initial aggressor in the incident that gave rise to the provocative act. There was no direct evidence that [the victim's] unidentified murderers were even present at the scene of the provocative act, i.e., in a position to actually witness [the] defendant shoot [the wounded man]. [The d]efendant himself was not present at the scene where [the victim] was fatally gunned down." (*Id.* at p. 872, fns. omitted.) Finally, and most importantly, "the actual murderers were not responding to [the] defendant's provocative act by shooting back at him or an accomplice, in the course of which someone was killed." (*Id.* at pp. 872–873.) Rather, "the acts of the actual murderers . . . were themselves criminal, felonious, and perpetrated with malice aforethought. The fatal shots were fired, not at the defendant or an accomplice, but instead at a third party ([the victim]) who was not a party to the initial provocative act. It can further be said that the murderers . . . 'intend[ed] to exploit the situation created by [the defendant], but [were] not acting in concert with him,' a circumstance that is 'normally held to relieve the first actor [the defendant] of criminal responsibility.' [Citation.] In short, nobody forced the Alley Boys' murderous response in this case, if indeed it was a direct response to [the] defendant's act of shooting [the wounded man]." (*Id.* at p. 874, fn. omitted.)

Although McDaniels was not convicted under a theory of provocative act murder, he argues that the facts here are sufficiently similar to those in *Cervantes* to demonstrate that proximate causation was lacking. He emphasizes that "[t]here was no prior history of antagonism" between Third World and the Bottoms; he was not the first to shoot; the evidence does not establish that he started firing before Pierce was shot; and, because the

18

actual killer was unknown, his own actions cannot be related to those of the actual killer, who may not have even been aware of him.

We will assume that none of the actions McDaniels took before he began firing were proven to be the proximate cause of Pierce's death.[9] As he observes, the record lacks evidence that there was a preexisting conflict between members of the two neighborhoods or that he was involved in the fight between J.G. and Harbin's girlfriend or any planned response to it. We also agree with him that under *Cervantes*, the mere fact he armed himself does not mean that he was "guilty for all the violence" that subsequently resulted. And finally, we agree that the record lacks evidence that he was the first to shoot or otherwise prompted the shootout to begin. Rather, the weight of the evidence, including his own statements, suggests that he did not begin shooting until Ambrose shot at Harbin's car, and there was no evidence that Ambrose or any other participant realized that McDaniels was armed before the shootout started.

Thus, the question we address is whether there was substantial evidence that by firing during the shootout McDaniels proximately caused Pierce's death. We conclude that there was. In doing so, we reject his arguments that there was insufficient evidence that he fired any shots before Pierce was hit or that his actions affected the actual killer.

To begin with, the ballistics evidence can be reasonably interpreted to support the hypothesis that McDaniels fired at least some shots before Pierce

---

[9] The firearm enhancement McDaniels directly challenges requires that the defendant's "discharge" of a firearm "proximately cause" great bodily injury or death. (§ 12022.53, subd. (d); *People v. Zarazua* (2008) 162 Cal.App.4th 1348, 1360.) Thus, even if we concluded that McDaniels performed an act before he began shooting that proximately caused Pierce's death, that act would not support imposition of this enhancement.

19

was hit. (See *Cravens*, *supra*, 53 Cal.4th at p. 508.) That evidence tied McDaniels to two guns: the unrecovered rifle and the Glock pistol. He does not contest that there was substantial evidence he shot the rifle, given J.G.'s older cousin's testimony that he had a similar firearm and Harbin's second girlfriend's testimony that Harbin had such a gun when he and McDaniels were at her apartment after the murder. And while McDaniels argues that the theory he also fired the Glock was "unsupported by the evidence," the jury could have reasonably inferred that he shot that gun as well, as the prosecutor argued it should. Although only Harbin's DNA was on the Glock, the casings from that weapon were scattered over a relatively wide area on 30th and near the sidewalk at the southwest corner of the intersection. It is highly unlikely that Harbin himself fired those shots, because there was no evidence that he ever exited his car at the scene after being shot at, much less got out of the car and shot a gun from at least two different locations on the street. Rather, given the close relationship between Harbin and McDaniels and their activities together after the murder, it is reasonable to conclude that if Harbin did not fire the Glock then McDaniels did.

In turn, the locations of the casings shot by the Glock and the rifle support the inference that the Glock was shot before Pierce was hit. The shootout began on 30th, slightly west of the intersection, as Harbin drove down 30th. Pierce was killed in front of her house on Chestnut, which was about a dozen houses south of the intersection. Since the participants were initially firing at each other across and up and down 30th, it is highly unlikely that Pierce was hit during the beginning of the shooting. Indeed, one of Pierce's neighbors testified that Pierce did not fall to the ground until after the second round of shots began.

20

From there, it is reasonable to infer that after the first round of shots, Ambrose and Sims escaped south on Chestnut, toward Pierce's house, and were fired upon from the north, at which point Pierce was hit. Ambrose testified he went that way as he continued to hear shots, and he collapsed by a house on Chestnut south of the intersection. In addition, a witness saw men running south on Chestnut, including one shot in the chest like Sims was. The same witness also saw a man with dreadlocks, likely Davis, pointing a gun toward the other men as they ran. While the four casings fired by the rifle were found on Chestnut, sufficiently south of 30th that they were most likely not fired during the first round of shooting, the majority of the casings shot by the Glock were in an area without a line of sight south on Chestnut. Thus, it is reasonable to infer the Glock was fired before the shooting moved south onto Chestnut, and thus before Pierce was hit.

Having concluded there was substantial evidence that McDaniels fired the Glock before Pierce was hit, we turn to whether there was substantial evidence that his shooting of the Glock was a proximate cause of Pierce's death. Based on his own statements, he shot at Ambrose after Ambrose shot at Harbin. He also shot at Sims after Sims fired on him. Ambrose and Sims then ran south on Chestnut, in the direction of Pierce's house. It is reasonable to infer that Ambrose and Sims were chased and shot at by another participant in the shootout—Davis—whose bullet hit Pierce. Although McDaniels emphasizes that the actual killer's identity was unknown, there was evidence that Davis was present and pointed a handgun toward Ambrose and Sims as they ran down Chestnut. And since Davis was not tied to any other gun used at the scene, it is also reasonable to infer that he fired the unrecovered revolver.

21

Under this scenario, when McDaniels shot the Glock at Ambrose and Sims, it was plainly foreseeable that they would be prompted to flee and, in turn, be chased and shot at by another shootout participant affiliated with Third World. It was also foreseeable that shooting at Ambrose and Sims as they fled could result in the death of a bystander.[10] Although McDaniels argues that there was no evidence the actual killer was aware he fired a gun, or even that he was present, our conclusion does not depend on such proof. It was the fact that Ambrose and Sims fled after McDaniels shot at them, not the actual killer's awareness that McDaniels was shooting, that provides the causal link between McDaniels's actions and the firing of the fatal shot. The actual killer's shooting was therefore merely a dependent intervening cause, because both it and the injury it caused were foreseeable, and sufficient evidence supported the conclusion that McDaniels proximately caused Pierce's death. (See *Cervantes*, *supra*, 26 Cal.4th at p. 871; *Brady*, *supra*, 129 Cal.App.4th at p. 1326.)

### B. *The Special Instruction on Proximate Cause Did Not Lessen the Prosecution's Burden of Proof.*

McDaniels claims that a special jury instruction on proximate cause included "a definition of an intervening independent act that had the effect of lowering the prosecution's burden of proof." We disagree.

#### 1. Additional facts

The jury was instructed on causation under CALCRIM No. 520 as follows: "An act causes death if the death is the direct, natural, and probable consequence of the act and the death would not have happened without the act. A natural and probable consequence is one that a reasonable person

---

[10] There is also substantial evidence that McDaniels himself chased Ambrose and Sims, based on the location of the rifle casings, but we do not rely on such conduct in concluding that proximate cause was established.

would know is likely to happen if nothing unusual intervenes. In deciding whether a consequence is natural and probable, consider all of the circumstances established by the evidence." (Italics omitted.) The jury was also instructed under CALCRIM No. 3149 on the causation required to prove the allegation that McDaniels personally and intentionally discharged a firearm causing death, which repeated the above-quoted portion of CALCRIM No. 520 and continued, "There may be more than one cause of death. An act causes death only if it is a substantial factor in causing the death. A substantial factor is more than a trivial or remote factor. However, it does not need to be the only factor that causes the death."

Finally, the jury was given a special instruction on causation. After repeating the language from CALCRIM Nos. 520 and 3149 quoted above, the instruction continued:

"If you have a reasonable doubt about whether the defendant's act caused the death, you must find him not guilty.

"There may be more than one proximate cause of the death[.] When the conduct of two or more persons contributes concurrently as the proximate cause of the death, the conduct of each is a proximate cause of the death if that conduct was also a substantial factor contributing to the result.

"In a homicide case in which the conduct of an intermediary is the actual cause of death, a defendant's liability will depend on whether it can be demonstrated that his own conduct proximately caused the victim's death. That is, whether it can be shown that the intermediary's conduct was merely a dependent, intervening cause of death and not an independent, superseding cause.

"If proximate causation is established, the defendant's . . . level of culpability for the homicide in turn will vary in accordance with his criminal intent. However, if an intermediary's conduct was an independent, superseding cause, the defendant is relieved of criminal liability. In order, though,

23

to be independent the intervening cause must be unforeseeable, an extraordinary and abnormal occurrence which rises to the level of an exonerating, superseding cause.

"On the other hand, a dependent, intervening cause will not relieve the defendant . . . of criminal liability. A defendant may be criminally liable for a result directly caused by his act, even if there is another contributing cause. If an intervening cause is a normal and reasonably foreseeable result of a defendant's original act, the intervening act is dependent and not a superseding cause and will not relieve the defendant of liability.

"The consequence need not have been a strong possibility. A possible consequence which might reasonably have been contemplated is enough. The precise consequence need not have been foreseen. It is enough that the defendant should have foreseen the possibility of some harm of the kind which might result from the act."

2.    Analysis

McDaniels argues that the special instruction on causation was erroneous because it "contain[ed] incompatible standards for an intervening independent act and an intervening dependent act." He observes that while an intervening dependent act was defined as "a normal and reasonably foreseeable result of a defendant's act," an intervening independent act was defined as "an extraordinary and abnormal occurrence which rises to the level of an exonerating, superseding cause" that "must be unforeseeable." He reasons that the instruction thus required the jury to find that the intervening act was unforeseeable, not just have a reasonable doubt about whether the act was reasonably foreseeable, before it could acquit.

" ' "In reviewing [a] purportedly erroneous instruction[], 'we inquire "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way" that violates the Constitution.' [Citation.] In conducting this inquiry, we are mindful that ' "a single instruction to a

24

jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." ' " ' " (*People v. Castaneda* (2011) 51 Cal.4th 1292, 1320–1321.)  We also " ' "must assume that jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given." ' " (*Id.* at p. 1321.)  We review claims of instructional error de novo.  (*People v. Posey* (2004) 32 Cal.4th 193, 218 (*Posey*).)

McDaniels does not contest that, in the abstract, the challenged instruction correctly defines the concepts of intervening independent act and intervening dependent act.  As he recognizes, the language at issue is drawn from *Cervantes*.  (See *Cervantes*, *supra*, 26 Cal.4th at p. 871.)  But he claims that "[i]nstead of focusing on whether the intermediary's conduct raises a reasonable doubt [about] whether the death was foreseeable," the instruction improperly "require[d] that the intermediary's act be unforeseeable and exonerating."  He argues this would likely have misled the jury into believing he had "the burden of raising or proving an independent, superseding cause" instead of that "the prosecution had the burden of proving beyond a reasonable doubt that an independent, superseding cause did not intervene."

We conclude there is no reasonable likelihood that the jury interpreted the challenged instruction in this manner.  To do so, a juror would have to disregard the balance of the instructions addressing the burden of proof.  As the Attorney General points out, the challenged instruction specifically directed, "If you have a reasonable doubt about whether the defendant's act caused the death, you must find him not guilty."  The jury was also instructed on the presumption of innocence and told the People had the burden to prove McDaniels guilty beyond a reasonable doubt.  Thus, "[t]he instructions as a whole made clear to the jury that the prosecution had the burden of proving every element of the charged crimes . . . beyond a

25

reasonable doubt. This is not a complex or difficult concept. There is no reasonable likelihood the jury would have parsed the instructions in such a way as to believe, contrary to what the [trial] court expressly informed it, that the prosecution had some lesser burden" of proving causation—much less that McDaniels had the burden of disproving it. (*People v. Livingston* (2012) 53 Cal.4th 1145, 1169.)

We reach this conclusion despite McDaniels's claim that the term "exonerating" as used in the challenged instruction was "problematic." We agree that, depending on the context, that term could refer to actual innocence, not merely legal innocence in the sense of not being proven guilty beyond a reasonable doubt. But the instruction explains that whether an intervening act is independent or dependent affects the defendant's "criminal liability," which clearly refers to legal innocence. Given the instructions as a whole, there is no reasonable likelihood that a juror would have resolved the potential ambiguity of the term "exonerating" by concluding that McDaniels had the burden to prove he did not cause Pierce's death. In short, this claim of instructional error fails.

C.  *Any Error in the Omission of an Instruction on Provocative Act Murder Was Harmless.*

McDaniels next claims that the trial court erred by not sua sponte instructing the jury on provocative act murder. Even though the doctrine is an alternative theory of murder, not a lesser included offense, he argues that it requires a higher standard of causation than the principles of proximate causation on which the jury was instructed. Thus, he reasons that if any jurors believed the doctrine otherwise applied, they might have decided causation was not proven and therefore not convicted him of murder. We reject this claim.

" 'The trial court is obligated to instruct the jury on all general principles of law relevant to the issues raised by the evidence, whether or not the defendant makes a formal request.' " (*People v. Rogers* (2006) 39 Cal.4th 826, 866.) "The general principles of law governing a case are those that are commonly connected with the facts adduced at trial and that are necessary for the jury's understanding of the case. [Citation.] The trial court must give instructions on every theory of the case supported by substantial evidence," but it "need not give instructions based solely on conjecture and speculation." (*People v. Young* (2005) 34 Cal.4th 1149, 1200.) In this context, "[e]vidence is 'substantial' only if a reasonable jury could find it persuasive." (*Ibid.*) Again, our review is de novo. (*Posey*, *supra*, 32 Cal.4th at p. 218.)

"The provocative act murder doctrine was originally conceived as a form of implied malice" which, as we have said, applies "to situations in which criminal defendants neither kill nor intend to kill, but cause a third party to kill in response to their life-threatening provocative acts." (*Cervantes*, *supra*, 26 Cal.4th at p. 867.) "Provocative act murder is not an independent crime with a fixed level of liability." (*People v. Concha* (2009) 47 Cal.4th 653, 663.) Rather, "[i]t is simply a type of murder," and "[t]he words 'provocative act murder' are merely shorthand used 'for that category of intervening-act causation cases in which, during a commission of a crime, the intermediary . . . is provoked by the defendant's conduct into [a response that results] in someone's death.' " (*Ibid.*)

The doctrine "has traditionally been invoked in cases in which the perpetrator of the underlying crime instigates a gun battle, either by firing first or by otherwise engaging in severe, life-threatening, and usually gun-wielding conduct, and the police, or a victim of the underlying crime, respond[] with privileged lethal force by shooting back and killing the

27

perpetrator's accomplice or an innocent bystander." (*Cervantes*, *supra*, 26 Cal.4th at p. 867.) It may also apply in other factual scenarios, however, such as "when the provoked shooter who responds with deadly force to the defendant's felonious and life-threatening provocative conduct is himself [or herself] engaged in criminal conduct." (*Id.* at p. 867, fn. 11; see, e.g., *People v. Gardner* (1995) 37 Cal.App.4th 473, 480 [defendant liable for provocative act murder where he shot at victim, and nearby drug dealer who mistakenly believed himself under attack fired back, killing victim].)

McDaniels argues that the trial court should have given a jury instruction on provocative act murder "such as CALCRIM No. 560." That instruction requires the People to prove four elements: (1) In committing an underlying crime, "the defendant intentionally did a provocative act"; (2) "[t]he defendant knew that the natural and probable consequences of the provocative act were dangerous to human life and then acted with conscious disregard for life"; (3) "[i]n response to the defendant's provocative act," a third party killed the victim; and (4) the victim's "death was the natural and probable consequence of the defendant's provocative act." (CALCRIM No. 560.) In relevant part, the instruction defines "provocative act" as one "[w]hose natural and probable consequences are dangerous to human life, because there is a high probability that the act will provoke a deadly response," and requires that "[a] reasonable person in the defendant's position would have foreseen that there was a high probability that his or her act could begin a chain of events resulting in someone's death." (*Ibid.*) The instruction also contains optional language instructing that a defendant is not guilty of murder if the victim's death "was caused solely by the independent criminal act of someone else. An independent criminal act is a

28

free, deliberate, and informed criminal act by a person who is not acting with the defendant." (*Ibid.*, italics omitted.)

We need not decide whether there was substantial evidence to support an instruction on provocative act murder, because McDaniels's premise that CALCRIM No. 560 requires a higher level of causation than did the special instruction on proximate cause is unsound. Accordingly, he fails to demonstrate that the omission of an instruction on provocative act murder was prejudicial under any standard.

McDaniels argues that CALCRIM No. 560 would have been "more favorable to [him] in that (1) the provocative act must have 'a high probability' of provoking a deadly response; and (2) the definition of an independent intervening act does not require[], as did the given instructions, that the intervening act be 'unforeseeable, an extraordinary and abnormal occurrence.'" We note that he claims CALCRIM No. 560 should have been given in addition to, not instead of, the special instruction. And he does not argue the special instruction was erroneous in any way relevant to this claim. Thus, in addressing his points, we assume that even if the jury should have been instructed with CALCRIM No. 560, the other instructions it received, including the special instruction, would have remained the same.

CALCRIM No. 560 defines a provocative act as an act "[w]hose natural and probable consequences are dangerous to human life, *because* there is a high probability that the act will provoke a deadly response." (CALCRIM No. 560, italics added.) In other words, a provocative act is an example of an act whose natural and probable consequences are dangerous to life, i.e., "likely to cause death if nothing unusual intervenes" under the other causation instructions, not a separate type of act whose consequences must be highly probable as opposed to merely likely. The ultimate outcome—

29

death—is likely to result from the defendant's act because the intervening act—a deadly response—is a highly probable result of the defendant's act. Thus, even if the jury could conclude that McDaniels did not commit a "provocative act" under CALCRIM No. 560 because there was not "a high probability that the act [would] provoke a deadly response," it could still have found he performed an act likely to cause death for another reason.

As for CALCRIM No. 560's optional language defining an "independent criminal act," it does not set a lower standard than that set by the special instruction's definition of "independent intervening cause" when the two instructions are read together. Under CALCRIM No. 560, the victim's death must be "caused solely by" the third party's criminal act for the act to relieve a defendant of liability. And under the special instruction, a defendant's act legally caused the death unless the third party's intervening act was "unforeseeable, an extraordinary and abnormal occurrence." Thus, for the death to be caused *solely* by a third party's criminal act under CALCRIM No. 560—meaning that the defendant's act did *not* proximately cause the death—the third party's act must constitute an independent intervening cause under the special instruction. Otherwise, the third party's act would be a dependent intervening cause, meaning the defendant's act still proximately caused the death. In short, even if the jury had been instructed with CALCRIM No. 560, it still would have to find that the independent criminal act was unforeseeable under the special instruction to conclude that the act relieved McDaniels of liability. Thus, it is not reasonably probable that he would have obtained a more favorable result had the jury been instructed on provocative act murder (see *People v. Watson* (1956) 46 Cal.2d 818, 836), and the omission of such an instruction was harmless beyond a reasonable doubt (see *Chapman v. California* (1967) 386 U.S. 18, 24).

30

### D. The Trial Court Had No Duty to Instruct Sua Sponte on the Lesser Included Offense of Involuntary Manslaughter.

McDaniels also claims the trial court erred by failing to instruct the jury on involuntary manslaughter, a lesser included offense of murder. (*People v. Cook* (2006) 39 Cal.4th 566, 596 (*Cook*).) He argues the instruction was warranted based on evidence that before Pierce was shot he "committed the misdemeanor of brandishing a firearm." We are not persuaded.

" ' "[A] defendant has a constitutional right to have the jury determine every material issue presented by the evidence . . . ." [Citations.]' [Citation.] 'To protect this right and the broader interest of safeguarding the jury's function of ascertaining the truth, a trial court must instruct on lesser included offenses . . . whenever there is substantial evidence raising a question as to whether all of the elements of the charged offense are present.' [Citation.] Conversely, even on request, a trial judge has no duty to instruct on any lesser offense *unless* there is substantial evidence to support such instruction." (*People v. Cunningham* (2001) 25 Cal.4th 926, 1007–1008.)

We review de novo whether there was substantial evidence to support an instruction on a lesser included offense. (*People v. Manriquez* (2005) 37 Cal.4th 547, 584.) In doing so, we do "not evaluate the credibility of witnesses, a task for the jury," and "view the evidence in the light most favorable to the defendant." (*People v. Millbrook* (2014) 222 Cal.App.4th 1122, 1137.) "[T]he existence of '*any* evidence, no matter how weak' will not justify instructions on a lesser included offense." (*People v. Breverman* (1998) 19 Cal.4th 142, 162.) Rather, " '[s]ubstantial evidence' in this context is ' "evidence from which a jury composed of reasonable [persons] could . . . conclude[]" ' that the lesser offense, but not the greater, was committed." (*Ibid.*)

31

Involuntary manslaughter is "the unlawful killing of a human being without malice . . . [¶] . . . in the commission of an unlawful act, not amounting to a felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection." (§ 192, subd. (b); *Cook*, *supra*, 39 Cal.4th at p. 596.) Involuntary manslaughter based on "an unlawful act, not amounting to a felony"—the only theory McDaniels claims might have applied—occurs when the killing results from the commission of a misdemeanor. Involuntary manslaughter under this theory requires proof the defendant acted not only with general criminal intent in committing the predicate misdemeanor but also with criminal negligence because the misdemeanor "was dangerous to human life or safety under the circumstances of its commission." (*People v. Cox* (2000) 23 Cal.4th 665, 667, 675.)

A trial court must instruct the jury on involuntary manslaughter if there is "substantial evidence from which the jury could find that the defendant lacked express or implied malice, but committed the lesser included offense of involuntary manslaughter." (*People v. Smith* (2021) 70 Cal.App.5th 298, 312, italics omitted; see *Cook*, *supra*, 39 Cal.4th at p. 596.) "Both murder (based on implied malice) and involuntary manslaughter involve a disregard for life; however, for murder the disregard is judged by a subjective standard whereas for involuntary manslaughter the disregard is judged by an objective standard. [Citations.] Implied malice murder requires a defendant's conscious disregard for life, meaning that the defendant subjectively appreciated the risk involved. [Citation.] In contrast, involuntary manslaughter merely requires a showing that a reasonable person would have been aware of the risk." (*People v. Butler* (2010) 187 Cal.App.4th 998, 1008.) In other words, " '[i]f a defendant commits an act

32

endangering human life, without realizing the risk involved, the defendant has acted with criminal negligence.  By contrast[,] where the defendant realizes and then acts in total disregard of the danger, the defendant is guilty of murder based on implied malice.' " (*People v. Guillen* (2014) 227 Cal.App.4th 934, 1027.)

McDaniels claims that an involuntary manslaughter instruction was warranted based on evidence that he "committed the misdemeanor of brandishing a firearm" under section 417, subdivision (b).  That provision makes it a crime for a person, "in the presence of any other person," to "draw[] or exhibit[] any . . . firearm in a rude, angry, or threatening manner" or, "in any manner, [to] unlawfully use[] a firearm in any fight or quarrel." (§ 417, subd. (b).)  McDaniels posits that if the jury determined he was not liable for Pierce's death based on his own shooting, either because he shot only after she was hit or because he shot in self-defense or defense of Harbin, it still "could reasonably have found that [the] act of brandishing a firearm [caused] any shooting in the first place."  McDaniels claims that under this scenario, absent an instruction on involuntary manslaughter, the jury would have been left "with an all-or-nothing choice between second[]degree murder and letting [him] walk free."

McDaniels fails to identify any evidence from which a reasonable juror could conclude that his brandishing of a firearm was objectively dangerous, meaning he acted with at least criminal negligence, but nevertheless "entertain a reasonable doubt" that he actually appreciated that risk, meaning he acted without implied malice. (*People v. Brothers* (2015) 236 Cal.App.4th 24, 34; *People v. Guillen*, *supra*, 227 Cal.App.4th at p. 1027.) We accept for the sake of argument that there was evidence from which the jury could conclude that McDaniels's brandishing of the rifle, but not his

33

shooting of it, proximately caused Pierce's death. Even so, McDaniels does not explain how, if that underlying act was objectively dangerous, a juror could have concluded that he did not realize the danger. He claims that the jury could have concluded that he had not formed *an intent to kill* at the time he brandished the weapon, but implied malice does not require such intent. If a reasonable person would have understood that under the circumstances brandishing the rifle was dangerous to human life, there is no apparent reason that McDaniels would not have so understood. In turn, if the jury concluded that he actually appreciated the objectively apparent risk and thus acted with implied malice, it would have still convicted him of murder. Accordingly, he fails to demonstrate that the trial court erred by not instructing the jury on involuntary manslaughter.

> E. *McDaniels Is Not Entitled to Relief Based on the Instruction that Implied Malice Murder Is a General Intent Crime.*

McDaniels next argues that reversal is required because the trial court erroneously instructed the jury that second degree implied malice murder is a general intent crime. Again, we review de novo a claim that an instruction was legally erroneous. (*Posey*, *supra*, 32 Cal.4th at p. 218.) We conclude that any error was cured by the other instructions.

The jury was instructed under a modified version of CALCRIM No. 252 regarding the union of act and intent. The instruction indicated that "second degree murder under a theory of implied malice as charged in Count 1" "require[s] general criminal intent." The instruction then explained that to find a person guilty of a general intent crime, "that person must not only commit the prohibited act, but must do so with wrongful intent. A person acts with wrongful intent when he or she intentionally does a prohibited act; however, it is not required that he or she intended to break the law. The act required is explained in the instruction for that crime." The instruction also

34

stated that "second degree murder under a theory of express malice" "requires a specific intent or mental state," explaining that for a person to be "guilty of this crime . . . , that person must not only intentionally commit the prohibited act, but must do so with a specific intent or mental state. The act and the specific intent or mental state required are explained in the instruction for that crime."

In turn, the general murder instruction, CALCRIM No. 520, provided that for McDaniels to be guilty of murder, the People had to prove that (1) he "committed an act that caused the death of another person" and (2) "[w]hen [he] acted, he had a state of mind called malice aforethought." The instruction further provided that McDaniels "act[ed] with *express malice* if he unlawfully intended to kill" and that he "act[ed] with *implied malice* if: [¶] 1. He intentionally committed an act; [¶] 2. The natural and probable consequences of the act were dangerous to human life; [¶] 3. At the time he acted, he knew his act was dangerous to human life; [¶] and 4. He deliberately acted with conscious disregard for human life."

McDaniels contends that implied malice murder "does not fit the definition of a general intent crime because it 'requires that the defendant act with knowledge of the danger to, and in conscious disregard of, human life[,]' which is a mental state." (Quoting *People v. Whitfield* (1994) 7 Cal.4th 437, 450 (*Whitfield*).) McDaniels does not argue that the mere fact the crime was described as one of general intent instead of specific intent was a problem. Instead, he claims that by including implied malice murder in the category of general intent crimes, the challenged instruction conveyed that implied malice murder required only "wrongful intent," and it referred the jury to CALCRIM No. 520 for the purpose of determining only whether he committed "[t]he act required," not whether he had the mental state required.

The law is unsettled on whether implied malice murder is better described as a specific intent crime or general intent crime. " '[T]he distinction between specific intent and general intent crimes evolved as a judicial response to the problem of the intoxicated offender,' " to differentiate between crimes for which voluntary intoxication may be exculpatory and those for which it is not. (*Whitfield*, *supra*, 7 Cal. 4th at p. 449; see *id.* at p. 463 (conc. & dis. opn. of Mosk, J.).) After observing that implied malice did not fit neatly into either category but is "closely akin" to specific intent, the *Whitfield* majority held that evidence of voluntary intoxication was admissible on the issue whether a defendant harbored implied malice. (*Id.* at pp. 450–451.)

*Whitfield*'s holding was later overturned by the Legislature, which amended former section 22 (now section 29.4) to "adopt[] Justice Mosk's position that evidence of voluntary intoxication is not admissible on the question of implied malice, that is, to prove that defendants did not know of the danger they were creating by their actions, or that they did not consciously disregard that danger." (*People v. Soto* (2018) 4 Cal.5th 968, 977.) But while implied malice is now in the same category as general intent crimes for purposes of section 29.4, it is not clear that the statutory amendment disturbed *Whitfield*'s determination that implied malice is more like specific intent than general intent. Indeed, the Bench Notes to CALCRIM No. 252 state that if a "crime requires a specific mental state, such as knowledge *or malice*, the court **must** insert the name of the offense in the third paragraph [addressing crimes requiring a specific intent or mental state], explaining the mental state requirement, *even if the crime is classified as a general intent offense*." (Italics added.)

Adding further support to McDaniels's position is *Ho v. Carey* (9th Cir. 2003) 332 F.3d 587, in which the Ninth Circuit Court of Appeals reversed a district court's denial of a California prisoner's habeas petition, holding that the state trial court erroneously instructed the jury that second degree implied malice murder was a general intent crime requiring that the defendant "intentionally [did] that which the law declares to be a crime" even if he "may not [have known] his act or conduct [was] unlawful." (*Id.* at p. 591.) Although the trial court later advised the jury that the general-intent instruction applied only to involuntary manslaughter, the court "did not inform the jury that it had mistakenly instructed it the previous day" that second degree implied malice murder required only general intent. (*Ibid.*) The Ninth Circuit concluded the error was not cured even though the jury was also given " 'all the standard instructions' " on murder, the relevant lesser included offenses, and self-defense, and both counsel argued that murder required a finding of malice. (*Id.* at pp. 591, 594.)

We reach a different conclusion than the Ninth Circuit did, based on the fact that CALCRIM No. 520 instructed the jury that malice was required to convict McDaniels of murder. As our state Supreme Court has explained, " '[T]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction.' [Citation.] Thus, ' "[t]he absence of an essential element in one instruction may be supplied by another or cured in light of the instructions as a whole." ' " (*People v. Delgado* (2017) 2 Cal.5th 544, 573–574.) Here, even if the challenged instruction effectively "omit[ted] a necessary element of the crime" of implied malice second degree murder (*Ho v. Carey*, *supra*, 332 F.3d at p. 593), CALCRIM No. 520 cured the omission. *Ho* disregarded the fact that there, the jury was also instructed

37

that malice was required for a conviction of second degree murder. (*Ho*, at p. 598 [dis. opn. of Hug, J.].) Moreover, a reasonable jury would not have interpreted the challenged instruction as directing it to apply CALCRIM No. 520 exclusively to determine the act required—one that "caused the death of another person"—while disregarding the balance of that instruction setting forth the requirements for implied malice. Rather, reading the instructions as a whole, the jury would have understood it had to find that McDaniels acted with malice, not just intentionally performed an act that caused Pierce's death, to convict him of murder. Thus, any error in the instruction that implied malice murder is a general intent crime was cured, and McDaniels is not entitled to relief.

### F. McDaniels Has Not Established that He Received Ineffective Assistance of Counsel.

McDaniels claims that his trial counsel made two errors constituting ineffective assistance of counsel. First, he faults counsel for not objecting when the prosecutor commented on his courtroom demeanor. Second, he argues that counsel should have requested a jury instruction based on Senate Bill 1437, which amended section 188 so that it now provides that "[m]alice shall not be imputed to a person based solely on his or her participation in a crime." Both contentions fail.

#### 1. General legal standards

Criminal defendants have the right to the effective assistance of counsel under the Sixth Amendment of the United States Constitution and article I, section 15 of the California Constitution. (*Strickland v. Washington* (1984) 466 U.S. 668, 687; *In re Long* (2020) 10 Cal.5th 764, 773.) To prevail on a claim of ineffective assistance of counsel, a defendant must show "that counsel's performance was deficient," such that "counsel was not functioning as the 'counsel' [constitutionally] guaranteed," and "that the deficient

38

performance prejudiced the defense." (*Strickland*, at p. 687; *People v. Centeno* (2014) 60 Cal.4th 659, 674.) Thus, a defendant must demonstrate both that (1) "counsel's performance . . . fell below an objective standard of reasonableness under prevailing professional norms" and (2) there was "a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different." (*People v. Mai* (2013) 57 Cal.4th 986, 1009 (*Mai*).)

"When examining an ineffective assistance claim, a reviewing court defers to counsel's reasonable tactical decisions, and there is a presumption counsel acted within the wide range of reasonable professional assistance. It is particularly difficult to prevail on an *appellate* claim of ineffective assistance. On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation. All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding." (*Mai*, *supra*, 57 Cal.4th at p. 1009.)

> ### 2. Counsel was not ineffective by failing to object to a stray comment about McDaniels's courtroom demeanor.

At the outset of his closing argument, the prosecutor addressed the jury as follows: "I talked to you in the beginning about Ms. Pierce, that you weren't going to see her throughout the trial. I knew that you were going to see Mr. McDaniels, smiling and interacting with his attorney. I knew that you would see Mr. Ambrose interacting with his attorney. And when you see them every day, sometimes you forget why we're here. [¶] We're here because Chyemil Pierce had her life taken. And oftentimes people say, Oh, they died, or somebody died, but when you are murdered, it's something that you can't

forget. Her life was taken and these two individuals played a significant role in that."

There was no immediate objection to the prosecutor's description of McDaniels as "smiling and interacting" with his trial counsel. In the defense's closing argument, however, counsel addressed the prosecutor's comment at length. Counsel noted that the comment "bothered [him] a little bit" because "neither [he] nor Mr. McDaniels was being disrespectful to the Court." Counsel explained, "Obviously the case is hard. I need . . . Mr. McDaniels to be at his best. I need him to assist me. He needs to answer my questions. He needs to tell me things that I don't know when I'm hearing direct examination by the prosecutor. So it's important for me to communicate with him. [¶] And on some of those occasions that he spoke with me, he did smile and laugh. And I'm really concerned that you'll think we're being disrespectful to you."

Counsel went on to explain that McDaniels realized the trial had high stakes and was under pressure, and "on occasion, he will have it affect him. He'll be out of sorts." Counsel continued, "[W]hen I see him that way and I know it, I can't have him be morose. I can't have him be that way. And I have to get him back working on the case with me, assisting me and advising me. [¶] So during those times of talking to him when you saw him laugh, it's oftentimes me telling him a family situation. Look, you know, my wife did this, my kids did this. And it's kind of funny and he'll laugh and then he'll relax. [¶] Now, why do I do that? Well, I'm an attorney. But you know the other word for attorney is 'counselor.' And counselors give counseling. And so that's why. It's not to be disrespectful."

Proceeding from the principle that "[i]t is misconduct . . . for a prosecutor to comment on a nontestifying defendant's demeanor or behavior

40

during the guilt phase of [a] trial" (*People v. Blacksher* (2011) 52 Cal.4th 769, 840), McDaniels argues that his trial counsel's failure to object to the prosecutor's comment "lacks any satisfactory explanation." Although McDaniels acknowledges that counsel responded to the comment in the defense's closing argument, he claims that counsel did so "weakly" and that counsel's concerns would have been better addressed "with a timely objection and an admonishment from the [trial] court for the jury not to consider McDaniels['s] courtroom behavior in reaching its verdict."

We find this claim unpersuasive. To begin with, the prosecutor made the challenged comment in passing and gave it little emphasis. Had McDaniels's trial counsel not addressed the comment at all, we would still likely reject the claim, because counsel could have reasonably decided not to call attention to the comment by asking for an admonition or attempting to explain his client's behavior. (See *Mai*, *supra*, 57 Cal.4th at p. 1009.) But counsel in fact responded, in our view effectively, by explaining his need to communicate with McDaniels and his attempts to cheer up his client. Although counsel could have also objected and asked for an admonition, we cannot say his failure to do so "fell below an objective standard of reasonableness under prevailing professional norms." (*Ibid.*)

Moreover, the failure to object to the prosecutor's comment was patently harmless. As we have said, it was merely a stray comment, and McDaniels's trial counsel lessened any possible prejudice by explaining why his client was smiling and interacting with him. Nor are we persuaded by McDaniels's argument that prejudice is established because "[l]aughing during trial is inconsistent with . . . a fear of danger," which the jury had to believe McDaniels possessed to find that he acted in self-defense. No rational juror would reject a claim of self-defense merely because the defendant

41

laughed or smiled at some point during the trial, in a context far removed from the dangerous situation. In sum, the record demonstrates neither unprofessional assistance nor prejudice, and the claim fails.

### 3. Counsel was not ineffective for failing to request an inapplicable instruction.

McDaniels also claims that his trial counsel rendered ineffective assistance by failing to request that the jury be instructed, consistent with newly amended section 188, "that malice could not be imputed based solely on participation in a crime." This claim lacks merit as well.

"Effective January 1, 2019, the Legislature passed Senate Bill 1437 'to amend the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.'" (*People v. Lewis* (2021) 11 Cal.5th 952, 959.) As part of these changes, the bill amended section 188 to provide that "[e]xcept as stated in subdivision (e) of Section 189"—which addresses when a defendant may be liable for felony murder—"in order to be convicted of murder, a principal in a crime shall act with malice aforethought. Malice shall not be imputed to a person based solely on his or her participation in a crime." (§ 188, subd. (a)(3); 2018 Cal. Stats. ch. 1015, § 2.)

The mental state required for implied malice is distinct from the natural and probable consequences doctrine Senate Bill 1437 eliminated. Implied malice requires, as the jury was instructed here, that "[t]he natural and probable consequences of the [defendant's] act were dangerous to human life" and that the defendant knew of this danger but "deliberately acted with conscious disregard for human life." In contrast, "the natural and probable consequences doctrine was 'a theory of vicarious liability under which "[a]n

aider and abettor [was] guilty not only of the intended, or target, crime but also of any other crime a principal in the target crime actually commit[ted] (the nontarget crime)" '—including murder—' "that [was] a natural and probable consequence of the target crime." ' " (*People v. Rivera* (2021) 62 Cal.App.5th 217, 231, review granted Jun. 9, 2021, S268405.) Although Senate Bill 1437 " 'abolished the natural and probable consequences doctrine' as a theory of vicarious liability, 'it maintained the viability of murder convictions based on implied malice, and the definition of implied malice remains unchanged.' [Citation.] In other words, a person may still be convicted of second degree murder . . . 'if the person knows that his or her conduct endangers the life of another and acts with conscious disregard for life.' " (*Rivera*, at p. 232.)

McDaniels argues that Senate Bill 1437's amendment of section 188 to provide that malice not be imputed based solely on a person's participation in a crime "was relevant to the adjudication of guilt" because he was also charged with being a felon in possession of a firearm on the same date that Pierce was killed. He notes there was evidence he may have committed other crimes, such as brandishing a firearm, "that the jury could have used to support a finding of malice." But the jury was not instructed on felony murder, and Senate Bill 1437 does not affect defendants like McDaniels who were prosecuted for murder solely on the theory they acted with actual malice. Thus, we agree with the Attorney General that the instruction McDaniels claims should have been given did not apply, and his trial counsel was not ineffective by failing to request it.

G. *McDaniels Has Not Demonstrated that the Prosecutor Committed Misconduct by Relying on Racial Stereotypes.*

McDaniels contends the prosecutor's use of racial stereotypes violated his rights to due process and a fair trial. Specifically, he claims the

prosecutor relied on racial stereotypes by attempting "to frame the incident as a dispute between neighborhoods" and by "[r]eferr[ing] to the Black males involved in the incident as 'boys.' " (Boldface and some capitalization omitted.) We are not persuaded on either count.

### 1. General legal standards

Although McDaniels does not call it such, his claim is essentially one of prosecutorial error. "Such error occurs, as a matter of state law, when a prosecutor 'engage[s] in deceptive or reprehensible tactics in order to persuade the trier of fact to convict.' [Citation.] Federal constitutional error occurs only when the prosecutor's actions 'comprise a pattern of conduct that is serious and egregious, such that the trial is rendered so unfair that the resulting conviction violates the defendant's right to due process of law.' " (*People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 854.)

" 'To prevail on a claim of prosecutorial misconduct based on remarks to the jury, the defendant must show a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner. [Citations.] In conducting this inquiry, we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.' " (*People v. Brown* (2003) 31 Cal.4th 518, 553–554; *People v. Clair* (1992) 2 Cal.4th 629, 663–664.)

"Prosecutorial argument that includes racial references appealing to or likely to incite racial prejudice violates the due process and equal protection guarantees of the Fourteenth Amendment to the federal Constitution." (*People v. Cudjo* (1993) 6 Cal.4th 585, 625; see *McCleskey v. Kemp* (1987) 481 U.S. 279, 309, fn. 30.) "Because racial prejudice can strongly compromise a juror's impartiality [citations], even neutral, nonderogatory references to race are improper absent compelling justification." (*Cudjo*, at pp. 625–626.)

### 2. The prosecutor's focus on a conflict between Third World and the Bottoms did not involve racial stereotypes.

McDaniels first argues that the prosecutor relied on racial stereotypes by pursuing the "theory that the gunfight was a result of a dispute between neighborhoods." We are not persuaded.

Before trial, Ambrose moved to exclude references to Third World and the Bottoms on the basis there was no evidence of a prior conflict between the two areas. In response, the prosecutor acknowledged this was not a gang case, but he opined that evidence about the neighborhoods was relevant to proving implied malice: Understanding that people affiliated with the Bottoms were on their way to Third World, people affiliated with Third World prepared by getting their guns. The trial court denied Ambrose's motion, concluding it was "perfectly fair" to have testimony that if "someone shows up from a different neighborhood in Oakland, that might raise a level of tension or create some sort of air of anxiety." The prosecutor then relied on the supposed conflict between the two neighborhoods as a central theme.

Initially, the Attorney General argues that McDaniels forfeited this claim by failing to object below. Generally, to preserve a claim of prosecutorial error, " 'a defendant must make a timely objection and request an admonition; only if an admonition would not have cured the harm is the claim of misconduct preserved for review.' " (*People v. Friend* (2009) 47 Cal.4th 1, 29.) We tend to agree with McDaniels that any objection to the prosecutor's references to the two neighborhoods would have been futile, given the ruling on Ambrose's motion in limine. The more fundamental problem, however, is that neither defendant sought to exclude neighborhood references on the basis they might play on racial stereotypes. Moreover, on appeal McDaniels does not challenge the court's ruling that such references

45

were appropriate. Accordingly, this claim is forfeited. Nevertheless, we will consider it on the merits.

We begin by agreeing with McDaniels that the prosecutor's theory of warring neighborhoods was weak, as multiple witnesses testified there was no preexisting conflict between the two areas. We cannot agree, however, that the prosecutor's "use of neighborhoods [was] a proxy for gang membership" that attempted to capitalize on "the racial stereotype that Black males are likely to be gang members." As McDaniels recognizes, the authorities "in support of the proposition that appeals to racial bias are unconstitutional refer to overt appeals to racism." (See, e.g., *United States v. Doe* (D.C. Cir. 1990) 903 F.2d 16, 23–26 [improper references to "Jamaicans"]; *McFarland v. Smith* (2d Cir. 1979) 611 F.2d 414, 416 [reliance on fact that witness and defendant were both Black to urge that witness was credible in incriminating defendant]; see also *People v. Cudjo*, *supra*, 6 Cal.4th at p. 625 [prosecutor argued victim unlikely consented to sex with stranger who was "a [B]lack man"].) Here, however, the prosecutor did not mention the race of McDaniels or any other participant in the shootout, whether in connection with the two neighborhoods or otherwise.

We accept that comments may be racially biased even if they do not explicitly refer to a particular group. But even if the prosecutor's focus on the two neighborhoods could be construed as suggesting that the men involved in the gunfight represented opposing gangs, there was no linking of the men's race to their supposed gang membership. It would be speculative to conclude that any juror understood the prosecutor to be suggesting that McDaniels was a gang member, and thus more likely to be guilty, *because* he is Black. Therefore, he fails to convince us that the prosecutor's focus on the two neighborhoods amounted to reliance on racial stereotypes.

46

3.  Viewed in context, the prosecutor's references to the male participants as "boys" was not an appeal to racial animus.

McDaniels also complains that the prosecutor referred to him and the other male participants in the gun battle as "boys." For example, in his opening statement, the prosecutor said, "Many of the witnesses will say as soon as the shots ring out, even the young ladies who are present, they all scatter. Who doesn't scatter, all the boys with the guns." He repeatedly referred to the male participants as "boys" when questioning witnesses, mostly R.B., and also used the term during his closing argument. Finally, he used the term "boy" in particular to describe McDaniels—who was 29 years old at the time of the shooting and 33 years old at the time of trial—while questioning R.B.

We agree with the Attorney General that McDaniels also forfeited this claim, because he did not object below to the prosecutor's use of the word "boy" or "boys." (See *People v. Friend, supra*, 47 Cal.4th at p. 29.) Nevertheless, we will address this argument on the merits as well.

Depending on the context, the use of the term "boy" may evince "racial animus" against Black men. (*Ash v. Tyson Foods, Inc.* (2006) 546 U.S. 454, 456.) While we accept this premise, we are unconvinced there is a reasonable likelihood that the prosecutor's use of the term was motivated by racial bias or triggered it in the jurors. To begin with, the prosecutor never addressed McDaniels as "boy," and referred to him in particular by that term only when examining R.B. In turn, R.B. referred to McDaniels as "the boy they call TJ" in her police interview, a recording of which was played for the jury. Indeed, with one exception, the prosecutor referred to McDaniels as a "boy" only when quoting R.B.'s interview statement. It is unlikely that any juror would have perceived the prosecutor's terminology as racially biased in these instances, given that it merely echoed R.B.'s own words. As for the exception,

47

when the prosecutor called McDaniels "the boy you [R.B.] were dating," we likewise doubt that any juror would have perceived this reference as racist.

We also disagree with McDaniels that the prosecutor's references to various groupings of the shooting participants as "boys" functioned as "a racist dog-whistle." McDaniels was arguably too old to make calling him a "boy" appropriate, and prosecutors should think twice before using terms like this that could be perceived as "demeaning and infantilizing" criminal defendants. But here, the record does not reveal the actual ages of most of the other participants aside from Ambrose, who in fact was a minor at the time of Pierce's killing, and witnesses described other participants as appearing very young. Thus, even accepting that calling the participants "boys" was disrespectful to McDaniels in particular, we cannot say that the term was so divorced from the actual ages of the participants that it conveyed racial animus.

In addition, we note the prosecutor also referred to various women involved in the events as "girls," which McDaniels does not claim was racist. We think this parity makes it less likely that the jurors would have interpreted the term "boys" as pejorative. Indeed, another theme of the trial was that the shooting was sparked by a "girl fight." Although McDaniels insists the prosecutor introduced the term "girl fight," Harbin's girlfriend independently described her confrontation with J.G. as a "girls' fight." Given the record as a whole, we are not persuaded that the prosecutor's adoption of terms and descriptions that witnesses also used conveyed racial animus.[11]

---

[11] The Attorney General states the prosecutor "is himself a gentleman of color." Our record does not confirm whether this is true.

*H.      No Cumulative Error Appears.*

Finally, McDaniels claims the cumulative impact of the errors he identifies requires reversal of his murder conviction.  The only potential errors we have identified are the omission of an instruction on provocative act murder and the instruction that implied malice murder is a general intent crime, which we conclude are still harmless even if considered collectively. Accordingly, we reject this claim as well.

III.
DISPOSITION

The judgment is affirmed.

_____

Humes, P.J.

WE CONCUR:

_____

Banke, J.

_____

Sanchez, J.

*People v. McDaniels*  A158181

50